**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

MAURICE GOODEN,             :
                             :    Civil Action No. 08-5321 (JAP)
          Plaintiff,   :
                             :
          v.             :    **OPINION**
                             :
MICHELE RICCI, et al.,     :
                             :
          Defendants.   :

**APPEARANCES:**

Plaintiff <u>pro</u> <u>se</u>:
Maurice Gooden
New Jersey State Prison
P.O. Box 861
Trenton, NJ  08625

Counsel for Defendant Michele Ricci
Jennifer S. Hsia
Deputy Attorney General
25 Market Street
Trenton, NJ 08625

Counsel for Defendants Moshkovich, Neelgund, DeFilippo
Michael J. Lunga
23 Vreeland Road
Suite 250
Florham Park, NJ 07932

**PISANO**, District Judge

    This matter was opened to the Court by Plaintiff Maurice Gooden filing a Complaint alleging that he was being involuntarily medicated by defendants in violation of his constitutional rights.  Plaintiff seeks all appropriate relief.

Now pending before this Court are (1) the Motion [47] of Defendants Marina Moshkovich, M.D., Flora DeFilippo, Ph.D., and Ashwini Neelgund, M.D. to dismiss the Complaint or, in the alternative, for summary judgment, and (2) the Motion [48] of Defendant Michele Ricci to dismiss the Complaint or, in the alternative, for summary judgment.  Plaintiff has not responded.[1] Accordingly, these Motions are now ready for decision.

## I.  DISMISSAL FOR FAILURE TO STATE A CLAIM

Under Federal Rule of Civil Procedure 12(b)(6), a court may grant a motion to dismiss if the complaint fails to state a claim upon which relief can be granted.  The Supreme Court set forth the standard for addressing a motion to dismiss under Rule 12(b)(6) in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 562, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  The Twombly Court stated that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"  Id. at 555 (internal citations omitted); see also Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007) (stating that standard of review for motion to dismiss

---

[1] Plaintiff's Letter request [52] for appointment of counsel was denied by Order [59] entered November 18, 2010.  Plaintiff has filed nothing since that time.

does not require courts to accept as true "unsupported conclusions and unwarranted inferences" or "legal conclusion[s] couched as factual allegation[s]." (internal quotation marks omitted)).  Therefore, for a complaint to withstand a motion to dismiss under Rule 12(b)(6), the "[f]actual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact) ..." Twombly, 550 U.S. at 555 (internal citations and footnote omitted).

More recently, the Supreme Court has emphasized that, when assessing the sufficiency of a civil complaint, a court must distinguish factual contentions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).  A complaint will be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. at 1949 (quoting Twombly, 550 U.S. at 570).  This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Fowler v. UPMC Shadyside, 578 F.3d 203, 2009 WL 2501662, *5 (3d Cir. August 18, 2009) (citations omitted).

3

II.  <u>SUMMARY JUDGMENT</u>

A district court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

No genuinely triable issue of material fact exists when the moving party demonstrates – based on the submitted evidence, and viewing the facts in the light most favorable to the non-moving party – that no rational jury could find in the non-movant's favor. <u>Ambruster v. Unisys Corp.</u>, 32 F.3d 768, 777 (3d Cir. 1994). Thus, the threshold enquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986). In deciding whether triable issues of material fact exist, a court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. <u>See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Pennsylvania Coal Ass'n v. Babbitt</u>, 63 F.3d 231, 236 (3d Cir. 1995); <u>Hancock Indus. v. Schaeffer</u>, 811 F.2d 225, 231 (3d Cir. 1987).

The moving party bears the burden of showing no genuine issue of material fact, and the non-movant opposes the motion by presenting affirmative evidence to the contrary. <u>Anderson v.</u>

4

Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986).  Under the
Rule, once the moving party has properly supported its showing of
no triable issue of fact and of an entitlement to judgment as a
matter of law, "its opponent must do more than simply show that
there is some metaphysical doubt as to the material facts."
Matsushita, 475 U.S. at 586 (citations omitted).  See also
Anderson, 477 U.S. at 247-48 ("By its very terms, this standard
provides that the mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that
there be no genuine issue of material fact.").

What the non-moving party must do is "go beyond the
pleadings and by [its] own affidavits, or by the 'depositions,
answers to interrogatories, and admissions on file,' designate
'specific facts showing that there is a genuine issue for
trial.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); see
also Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990)
("The object of [Rule 56(e)] is not to replace conclusory
allegations of the complaint ... with conclusory allegations of
an affidavit."); Anderson, 477 U.S. at 249; Big Apple BMW, Inc.
v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert.
denied, 507 U.S. 912 (1993) ("To raise a genuine issue of
material fact, ... the opponent need not match, item for item,
each piece of evidence proffered by the movant," but must

"exceed[] the ' mere scintilla' threshold and ... offer[] a genuine issue of material fact.").

A movant need not affirmatively disprove the other party's case; he may move on the ground that the non-movant lacks evidence "sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Nevertheless, again, it is not sufficient to support a motion with only conclusory assertions that the non-movant has no evidence to prove his case. To the contrary, as Justice White warned, in his concurring opinion in Celotex, "It is the defendant's task to negate, if he can, the claimed basis for the suit." Celotex, 477 U.S. at 328 (Justice White, concurring). Celotex's progeny reflects that sentiment – that the movant bears the burden of demonstrating the lack of evidence in the record to support the non-movant's claims. See, e.g., Haywood v. Nye, 999 F.Supp. 1451, 1463 (D. Utah 1998); Andrews v. Crump, 984 F.Supp. 393, 402-03 (W.D.N.C. 1996).

### III.  BACKGROUND

Plaintiff Maurice Gooden is confined at New Jersey State Prison. It appears from the record before the Court that he was a pre-trial detainee at the time of the events complained of.

In the Complaint dated October 14, 2008, Plaintiff alleges that in October 2006, he was transferred from Atlantic County Jail to New Jersey State Prison, where he was placed on 23-hour

and 45-minute a day lockdown and was subjected to "all types of psychological tests."  He alleges that he was diagnosed as "bipolar."  He alleges that, since January 19, 2007, he has been forced to take various medications including Geodon, Risperdal Consta, and Haldol.  Plaintiff alleges that he has suffered numerous side effects from these medications, including swallowing of his tongue, numbness and burning of his skin, and feeling like his blood is on fire.  Plaintiff alleges that multiple doctors and correctional officers hold him down while shots containing these medications are forcibly administered. Plaintiff alleges that his mental condition does not require him to be medicated at all, much less in this manner, with these medications.  The remaining medical professionals against whom this claim of unlawful forced medication is asserted are Marina Moshkovich, M.D., Flora DeFilippo, Ph.D., and Ashwini Neelgund, M.D. (hereinafter, the "Medical Defendants").

In addition, Plaintiff alleges that Administrator Michele Ricci makes her presence known in the facility, knows of situations that are not right in the facility, and makes no effort to straighten them.

The Medical Defendants have moved to dismiss, or for summary judgment, on the grounds that the record reflects that the defendants were not deliberately indifferent to Plaintiff's

serious medical needs[2] and that, under the Due Process Clause,
forced medication can be given to inmates as long as proper
procedures are followed, as the Medical Defendants assert they
were in this instance.  In support of their Motion, the Medical
Defendants have submitted the affidavits and supporting exhibits[3]
of (1) Dr. Herbert Kaldany, the Psychiatric Director for the New
Jersey Department of Corrections, of (2) Defendant Flora
DeFilippo, Ph.D., a licensed psychologist employed by University
Correctional Health Care, a division of the University of
Medicine and Dentistry of New Jersey, and Clinical Supervisor in
charge of the Outpatient Mental Health Program, and of (3) the
Defendant Dr. Marina Moshkovich, M.D., a licensed psychiatrist
employed by University Correctional Health Care, who was the

_____

[2] The Medical Defendants' reliance on the Eighth Amendment
to the U.S. Constitution is misplaced, as Plaintiff was a pre-
trial detainee at the time of the events complained of.
Accordingly, the propriety of his conditions of confinement,
including medical treatment, must be measured by the requirements
of the Fourteenth Amendment Due Process Clause.  See Bell v.
Wolfish, 441 U.S. 520 (1979); Hubbard v. Taylor, 399 F.3d 150
(3d Cir. 2005); Fuentes v. Wagner, 206 F.3d 335, 341 (3d Cir.
2000).

The New Jersey Department of Corrections Offender Search Web
Page, states that Plaintiff was sentenced on or about October 30,
2009, upon his conviction for aggravated assault, N.J.S.A. 2C:12-
1B(3).  See
https://www6.state.nj.us/DOC_Inmate/details?x=1008881&n=1 .

[3] The supporting exhibits include copies of the pertinent
polices, as well as the Minutes of the Treatment Review
Committees which authorized placing Plaintiff on a forced
medication protocol.

psychiatrist in charge of Plaintiff's mental health treatment from 2007 until she became aware of this action in April of 2010. In addition, the Medical Defendants have submitted more than 1300 pages of medical records for in camera review.

Administrator Ricci has moved to dismiss, or for summary judgment, on the ground that Plaintiff failed to exhaust his administrative remedies and on various grounds related to the merits of the claims, including that Administrator Ricci reasonably relied upon the decisions of health care professionals. Administrator Ricci's Motion is supported by the affidavit of Brenda A. Hutton, an Executive Assistant at New Jersey State Prison, documentation regarding the administrative remedy process, and copies of Plaintiff's Administrative Remedy System Forms.

From the documentation submitted in support of Defendants' motions, which Plaintiff has declined to dispute, it is clear that Plaintiff was, as he stated, transferred to New Jersey State Prison on or about October 26, 2006, where he was immediately evaluated for both physical and mental health.[4]  He was promptly

---

[4] Plaintiff had previously been in custody at Northern State Prison, pursuant to a prior conviction, from which he was released on or about May 2006.  Plaintiff thus had pre-existing medical records with the New Jersey Department of Corrections, and there were records reflecting a prior involuntary medication protocol in effect from January 7, 2006, through July 5, 2006. The conditions under which Plaintiff was confined for observation of his physical and mental health, taking into account his medical and criminal history, were unquestionably reasonable.

diagnosed with bipolar disorder, antisocial personality disorder, and impulse control disorder. However, the treating staff found no need for involuntary medication based upon his behavior at that time.

By November 2006, Plaintiff was screaming day and night, interfering with other inmates' activities and sleep. He had stopped cooperating with his social worker and was refusing medications. Plaintiff's behavior continued to deteriorate and, by January 2007, Plaintiff was becoming more disruptive, was kicking his cell door and being openly hostile to prison staff. Plaintiff began to make threats to staff and to their families. He exhibited extreme anger and was unable to calm himself. He began to throw his food trays and to exhibit repeated sexual behavior, in an apparent effort to shock staff. His treating staff noted in Plaintiff's chart their concerns that he was becoming a danger to himself or others. He was repeatedly counseled about his mental illness and treatment needs, but demonstrated no insight into either.

On January 9, 2007, Ifeoma Anwunah-Okoye, M.D., prescribed Geodon 20 milligram capsules, to be increased over time to 40 milligrams, then 60 milligrams. On January 10, 2007, Plaintiff went to the clinic for a physical examination, but was too agitated to be examined or to have fluids drawn for lab work. On the same date, he placed a blanket over the window of the door to

his cell, making observations more difficult.  On January 11, 2007, the increase in his medication was moved up due to the severity of his "manic" symptoms.  On January 11, 2007, Plaintiff first refused his psychotropic medication, asserting that he "does not take medication."  Over the following days, he continued to refuse the medication, asserting that he could not tolerate the side effects.

On January 17, 2007, Dr. Anwunah-Okoye submitted a recommendation that Plaintiff be placed on an involuntary medication protocol, including, subject to TRC approval, Haldol (by injection) and Benadryl (by injection) when Plaintiff refused his oral Geodon.  The recommendation was supported by an Involuntary Medication Report detailing Plaintiff's behavior, diagnosis, and treatment history.  That recommendation was referred to a Treatment Review Committee ("TRC"), consisting of Executive Assistant Brenda Smith, Dr. Neelgund, and Dr. DeFilippo.  While that recommendation was pending, Plaintiff continued to refuse his psychotropic medications and continued to be aggressive, uncooperative, and threatening with staff.  On January 23, 2007, Depakote was added to his medication regimen. On January 23, 2007, the TRC unanimously approved the request for

forced medication, effective through February 22, 2007.[5]
Plaintiff did not appeal the decision.

Plaintiff continued to be uncooperative in taking his
medications.  Thus, on February 19, 2007, Dr. Moshkovich
requested that the forced medication protocol be approved for 180
days.  Again, Plaintiff was assigned a Staff Advisor and received
advance notice of the hearing and of his rights.  Plaintiff
refused to attend the hearing on February 23, 2007.  Accordingly,
the TRC, consisting of Ms. Brenda Smith, Dr. Ashwini Neelgund,
and Dr. DeFilippo, interviewed Plaintiff in his cell.[6]  The TRC

---

[5] The Minutes of the TRC reflect that Plaintiff Social
Worker Ann Doherty, Plaintiff's assigned Staff Advisor, gave
Plaintiff notice on January 22, 2007, of the TRC hearing
scheduled for the next day.  The notice includes advice regarding
the prisoner's rights to appear and make a statement to the TRC,
to have the aid of a Staff Advisor, to have disclosed to the
prisoner the evidence which supports involuntary medication (to
the extent consistent with the prisoner's best medical interests
and institutional security), to receive a written report of the
TRC's findings, to present documentary evidence, to call
witnesses, and to cross-examine witnesses called by the TRC.

Ms. Doherty reported that his remarks to her were
"scatological and nonsensical" and that he asked her to leave.
On January 23, 2007, the TRC met with Plaintiff.  Plaintiff
disputed his diagnosis and the need for any psychotropic
medication.  He had pressured and disorganized speech with manic
tangential ideation.  Plaintiff was agitated and quickly became
angry during the meeting.  Based on the interview and the
Involuntary Medication Report, the TRC approved Plaintiff's
placement on a forced medication protocol for 30 days.

[6] The minutes of the TRC reflect that Plaintiff "presented
agitated, manic, tangential and quickly angered.  He escalated
through the Forced Medication process and continued (to get
louder) as the committee stood present at his cell door.  No
insight into his mental illness/medication, as well as loss of

unanimously approved the application for extension of the forced medication protocol through August 22, 2007.  Plaintiff did not appeal this decision.

On February 28, 2007, Plaintiff's social worker made a chart notation that his behavior was inconsistent, leading to the concern that Plaintiff was not actually swallowing his oral medications, even on days that he appeared to take the medication voluntarily.  On March 6, 2007, lab results confirmed that Plaintiff was not swallowing his Depakote.  Accordingly, his medication was changed to Risperdal Consta by injection.  On March 8, 2007, Plaintiff was forcibly medicated after he refused to voluntarily submit to the prescribed injection.  To give Plaintiff the injection, prison staff escorted him to a restraint chair.  Plaintiff was given the injection in his thigh and the medical records reflect that he tolerated it well.  In August 2007, before the forced medication order expired, Plaintiff was transferred out of New Jersey State Prison for reasons related to his then-pending state charges.

Plaintiff returned to New Jersey State Prison on or about November 17, 2007.  At that time, it was noted in his chart that he had also been diagnosed diabetic and was prescribed oral glucophage.  Beginning on November 26, 2007, Plaintiff was given

---

association."  The minutes reflect that, because Plaintiff was so loud and agitated, it was difficult to understand what Plaintiff was saying.

his first injection of Risperdal Consta, since his return to New Jersey State Prison, which he took voluntarily.  He continued to take his medications voluntarily, apparently (as reflected in chart notes) under the misimpression that he was still under a forced medication order.

By March 2008, however, Plaintiff was beginning to be uncooperative, again.[7]  Accordingly, on April 4, 2008, Dr. Moshkovich submitted an Involuntary Medication Report and request for a TRC to consider again placing Plaintiff on a forced medication protocol for 180 days.  The TRC consisted of Assistant Superintendent Charles Warren, Dr. Ashwini Neelgund, and psychologist Dr. Gibbons.  As previously, social worker Ann Doherty was Plaintiff's Staff Advisor and she provided him advance notice of the hearing and of his procedural rights.  The TRC met with Plaintiff on April 9, 2008.  As previously, Plaintiff refused to attend the hearing, so the TRC met with him at his cell.[8]  Based on the interview and the Involuntary Medication Report, the TRC unanimously approved the forced

---

[7] Also, in April 2008, Plaintiff began to refuse finger sticks for testing of his blood sugar.  In May, 2008, he began to refuse to voluntarily permit fluids to be drawn for lab work.

[8] The TRC Minutes reflect that "Inmate Gooden presented talkative, agitated and demonstrated circumstantial thought process.  Inmate Gooden lacks judgment and has no insight into his mental illness or his need for treatment."  The TRC Minutes also reflect, as did the previous minutes, consideration of the potential side effects of the proposed medications and the need for monitoring and appropriate treatment of those side effects.

medication protocol, effective April 9, 2008, through October 1, 2008.  Through his Staff Advisor, Plaintiff appealed this TRC decision, on the grounds that he had been charge-free for over a year, that he was a county inmate and should not be subject to New Jersey State Prison rules, that he was never given an opportunity to take medication by mouth, that he is not a threat to anybody because he is confined separately, and because he had no mental health issues.  Dr. Rusty Reeves denied the appeal on April 10, 2008.

Plaintiff continued to take his medications voluntarily until lab results in May 2008 reflected that he was again failing to swallow Depakote.  On May 11, 2008, he openly refused the Depakote.  On May 13, 2008, he refused the Risperdal injection.  Through May, 2008, Plaintiff continued to resist or refuse his medications and exhibited anger at the nurse who tried to give him his medications.  In June, 2008, Plaintiff became more cooperative in taking his medications.  However, in  August, September and October 2008, Plaintiff submitted several Inmate Remedy System Forms, challenging his forced medication.[9]  He also became uncooperative with staff.  Accordingly, on September 19,

---

[9] Each of these Administrative Remedy System Forms consists of several parts: Part 1, for the inmate's complaint; Part 2, for initial review and referral to the appropriate staff member; Part 3, the staff response; Part 4, for the inmate's administrative appeal; Part 5, for the appeal decision.  Plaintiff did not appeal the initial denial of any of his administrative remedies.

15

2008, Dr. Moshkovich again requested that the TRC approve a forced medication order, for another 180 days, as supported by a new Involuntary Medication Report.  Thomas Steckel was assigned as Plaintiff's Staff Advisor and gave Plaintiff advance notice of the hearing and of his procedural rights.

The TRC consisted of Mr. Jeffrey Bell, Dr. Ashwini Neelgund, and Dr. DeFilippo.[10]  Based on the Involuntary Medication Report and Plaintiff's medication records, the TRC unanimously approved an extension of the forced medication protocol, effective September 30, 2008, through March 17, 2009.  Again, Plaintiff appealed the decision, and Dr. Rusty Reeves denied the appeal.

On October 16, 2008, Plaintiff refused to take his Risperdal Consta injection, so he was placed in a restraint chair by correctional officers and forcibly medicated.  Thereafter, through November 24, 2008, Plaintiff took his medication voluntarily.

Defendants also submitted to this Court TRC Minutes for a TRC hearing on July 15, 2010, after commencement of this litigation.  The July 2010 hearing proceeded, in all relevant particulars, as had the earlier proceedings.  The TRC unanimously

---

[10] The TRC Minutes reflect that the TRC interviewed Plaintiff.  When the Committee asked Plaintiff why he refused to take his oral medication, he stated that he felt that acting out would help his situation.  He stated that taking his medications would not bring back his loved ones or get him out of this situation.

approved placing Plaintiff on a forced medication protocol for 180 days.

IV.   <u>DISCUSSION</u>

A.   <u>Exhaustion of Administrative Remedies</u>

Defendant Administrator Ricci has moved to dismiss, or for summary judgment, on the ground that Plaintiff failed to exhaust his administrative remedies.[11]

Pursuant to 42 U.S.C. § 1997e(a):

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Exhaustion is mandatory.  Prisoners must exhaust all "available" administrative remedies, even where the relief sought, for example, monetary damages, cannot be granted by the administrative process.  <u>See</u> <u>Booth v. Churner</u>, 532 U.S. 731, 734, 739 (2001).

"[F]ailure to exhaust is an affirmative defense under the PLRA, and ... inmates are not required to specially plead or demonstrate exhaustion in their complaints."  <u>Wallace v. Kato</u>, 127 S.Ct. 910, 921 (2007).

Section 1997e(a) requires "proper exhaustion," as that term is used in administrative law.  <u>Woodford v. Ngo</u>, 126 S.Ct. 2378,

---

[11] As all Defendants rely extensively on documents outside the pleadings, their Motions will be treated as Motions for Summary Judgment.  <u>See</u> Fed.R.Civ.P. 12(d), 56.

2387 (2006).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules."  Id. at 2386.  Compliance with prison grievance procedures is all that is required for "proper exhaustion."  "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  Jones v. Bock, 127 S.Ct. at 922-23 (holding that exhaustion was not per se inadequate simply because an individual later sued was not named in the grievance, where prison policy did not require the prisoner to identify a particular responsible party).  See also Spruill v. Gillis, 372 F.3d 213, 231 (3d Cir. 2004) ("prison grievance procedures supply the yardstick" for determining what steps are required for exhaustion).

The Court of Appeals for the Third Circuit has held that the exhaustion requirement includes a procedural default component. See Spruill v. Gillis, 372 F.3d at 230.  A court may consider extrinsic materials for determining whether a procedural default should be excused.  See Williams v. Beard, 482 F.3d 637 (3d Cir. 2007).

Pursuant to N.J.A.C. 10A:8-1.1 to -3.6, the New Jersey State Prison adopted an Inmate Handbook which set forth information about the Inmate Request and Remedy Form System.  The "Inmate

18

Request System & Remedy Form," ("IRSF") is used "to provide a procedure for ... addressing, on a first step basis through the inmate request coordinator, concerns, problems or complaints which may be experienced on a daily basis." (Emphasis in original.)  Under ordinary circumstances, the IRSF will be processed within 30 working days.  In addition, the Handbook provides that the prisoner may appeal a staff response to the IRSF.  The appeal must be submitted within 10 days of the date the staff response is returned to the prisoner, must be submitted using the yellow copy of the IRSF returned to the prisoner, must utilize Part 4 of the form (designated for appeals), and may utilize additional paper.  An appeal with a decision rendered completes the process at the institutional level.  This policy was in effect during the period of the events complained of, until, in 2008, the New Jersey Department of Corrections adopted a standardized Inmate Handbook for all New Jersey Department of Corrections facilities.  The NJDOC procedures essentially mirrored the previous procedures at New Jersey State Prison, although requests are divided into three categories: a "Routine Inmate Request," an "Interview Request," or an "Administrative Appeal."  In addition, however, the NJDOC Handbook provides:

> All inmates may use the Inmate Remedy System.  You must
> use this system to help you obtain information and
> present your issues, concerns or complaints relative to
> issues or conditions under the jurisdiction of the
> NJDOC that affect you personally.  This process must be
> used ... to request an appeal of a decision or finding

19

> rendered by correctional facility staff in regard to a
> "Routine Inmate Request" ... that you have previously
> presented.

(Emphasis added.)  There is no administrative appeal beyond the

first level of appeal at the correctional institution level.

In addition, under the New Jersey Department of Corrections

Mental Health Services Internal Management Procedures regarding

Non-Emergency Involuntary Medication Administration, a prisoner

has 24 hours after a TRC decision to appeal.  The sole basis for

appeal, however, is "that the authorization policy was not

followed."  The prisoner may not appeal the TRC decision on the

merits.  (NJDOC Mental Health Services Internal Management

Procedures for Non-Emergency Involuntary Medication

Administration at ¶ IV.B.3.)

Here, Plaintiff was required to exhaust all available

administrative remedies, including both the direct administrative

appeals from the TRC decision and the general inmate

administrative remedies.  Cf., e.g., Dasta v. Shearin, 2007 WL

4952768 (D. Minn. Nov. 15, 2007) (where prisoner asserts

constitutional claims, common law tort claims, and claims under

the Federal Tort Claims Act, he must exhaust both the prison

administrative remedies and the statutory administrative remedies

under the FTCA), Report and Recommendation Adopted as Modified,

2008 WL 189953 (D. Minn. Jan. 22, 2008).

Plaintiff exhausted his direct appeals from the TRC decisions in April and September 2008.  Contemporaneously, from August through October of 2008, Plaintiff initiated several inmate remedies through the general inmate remedy system. However, he failed to appeal <u>any</u> of those decisions.[12]

Accordingly, Plaintiff has failed to exhaust his administrative remedies, as required by 28 U.S.C. § 1997e(a) and the Complaint may be dismissed, without prejudice, as against all Defendants for this reason.

B.   <u>Propriety of Forcible Medication Protocol</u>

The Defendants also assert entitlement to summary judgment on the merits of the claim that they violated Plaintiff's constitutional rights by forcibly medicating him.

In <u>Washington v. Harper</u>, 494 U.S. 210 (1990), the Supreme Court considered the question whether and under what circumstances a state could forcibly administer antipsychotic drugs to a prisoner.  The prisoner challenging the forcible administration of medication in that case had been diagnosed with a manic-depressive disorder, as is Plaintiff here.  Forced administration of medication had been ordered pursuant to a policy with several substantive and procedural components.

First, if a psychiatrist determines that an inmate should be treated with antipsychotic drugs but the

---

[12] Plaintiff also filed an inmate remedy in January 2010 and failed to appeal the decision.

21

inmate does not consent, the inmate may be subjected to involuntary treatment with the drugs only if he (a) suffers from a "mental disorder" and (2) is "gravely disabled" or poses a "likelihood of serious harm" to himself, others, or their property.  Only a psychiatrist may order or approve the medication.  Second, an inmate who refuses to take the medication voluntarily is entitled to a hearing before a special committee consisting of a psychiatrist, a psychologist, and the Associate Superintendent of the Center, none of whom may be, at the time of the hearing, involved in the inmate's treatment or diagnosis.  If the committee determines by a majority vote that the inmate suffers from a mental disorder and is gravely disabled or dangers, the inmate may be medicated against his will, provided the psychiatrist is in the majority.

Third, the inmate has certain procedural rights before, during, and after the hearing.  He must be given at least 24 hours notice of the Centers intent to convene an involuntary medication hearing, during which he may not be medicated.  In addition, he must receive notice of the tentative diagnosis, the factual basis for the diagnosis, and why the staff believes medication is necessary.  At the hearing, the inmate has the right to attend, to present evidence, including witnesses; to cross-examine staff witnesses; and to the assistance of a lay adviser who has not been involved in his case and who understands the psychiatric issues involved.  Minutes of the hearing must e kept, and a copy provided to the inmate.  The inmate has the right to appeal the committee's decision to the Superintendent of the Center within 24 hours, and the Superintendent must decide the appeal within 24 hours after its receipt.  The inmate may seek judicial review of a committee decision in state court by means of a personal restraint petition or extraordinary writ.

Fourth, after the initial hearing, involuntary medication can continue only with periodic review.

Washington, 494 U.S. at 215-16 (footnote and citations omitted).

Evaluating the circumstances under which antipsychotic drugs could be forcibly administered to an inmate, in keeping with the Due Process Clause of the Fourteenth Amendment, the Supreme Court

noted that the issue involved both substantive and procedural components.

> [T]he substantive issue is what factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will; the procedural issue is whether the State's nonjudicial mechanisms used to determine the facts in a particular case are sufficient.

Washington, 494 U.S. at 221.

The Court held that both the State policy at issue, and the Due Process Clause of the Fourteenth Amendment conferred upon prisoners a right "to be free from the arbitrary administration of antipsychotic medication." Id. at 221-22 (citing, inter alia, Vitek v. Jones, 445 U.S. 480 (1980) and Youngberg v. Romeo, 457 U.S. 307 (1982)).

With respect to the substantive due process aspect of the challenge, the Court found the challenged policy to be valid and reasonable under the test of Turner v. Safley, 482 U.S. 78, 89 (1987) (the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is "reasonably related to legitimate penological interests"). To reach its conclusion, the Court applied three of the Turner reasonableness factors:

> "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." Second, a court must consider "the impact accommodation of the asserted constitutional right will have on

23

guards and other inmates, and on the allocation of
prison resources generally." Third, "the absence of
ready alternatives is evidence of the reasonableness of
a prison regulation," but this does not mean that
prison officials "have to set up and then shoot down
every conceivable alternative method of accommodating
the claimant's constitutional complaint."

Applying these factors to the regulation before
us, we conclude that the Policy comports with
constitutional requirements. There can be little doubt
as to both the legitimacy and the importance of the
governmental interest presented here. There are few
cases in which the State's interest in combating the
danger posed by a person to both himself and others is
greater than in a prison environment, which, "by
definition, is made up of persons with "a demonstrated
proclivity for antisocial criminal, and often violent,
conduct." We confront here the State's obligations,
not just its interests. The State has undertaken the
obligation to provide prisoners with medical treatment
consistent not only with their own medical interests,
but also with the needs of the institution. Prison
administrators have not only an interest in ensuring
the safety of prison staffs and administrative
personnel, but also the duty to take reasonable
measures for the prisoners' own safety. These concerns
have added weight when a penal institution ... is
restricted to inmates with mental illnesses. Where the
inmate's mental disability is the root cause of the
threat he poses to the inmate population, the State's
interest in decreasing the danger to others necessarily
encompasses an interest in providing him with medical
treatment for his illness.

[The challenged policy] is a rational means of
furthering the State's legitimate objectives. Its
exclusive application is to inmates who are mentally
ill and who, as a result of their illness, are gravely
disabled or represent a significant danger to
themselves or others. The drugs may be administered
for no purpose other than treatment, and only under the
direction of a licensed psychiatrist. There is
considerable debate over the potential side effects of
antipsychotic medications, but there is little dispute
in the psychiatric profession that proper use of the
drugs is one of the most effective means of treating

24

and controlling a mental illness likely to cause
violent behavior.

Id. at 224-26 (citations  and footnote omitted).

Thus, the Court held that

given the requirements of the prison environment, the
Due Process Clause permits the State to treat a prison
inmate who has a serious mental illness with
antipsychotic drugs against his will, if the inmate is
dangerous to himself or others and the treatment is in
the inmate's medical interest.  [The challenged policy]
comports with these requirements; we therefore reject
respondent's contention that its substantive standards
are deficient under the Constitution.

Id. at 227.

Moving to the procedural due process issue, the Court noted

that the procedural protections required by the Due Process

Clause must be determined with reference to the rights and

interests at stake in the particular case.

The factors that guide us are well established.  Under
Mathews v. Eldridge, 424 U.S. 319, 335 (1976), we
consider the private interests at stake in a
governmental decision, the governmental interests
involved, and the value of procedural requirements in
determining what process is due under the Fourteenth
Amendment.

Id. at 229 (citations omitted).

The Court took note of the prisoner's substantial interest

in avoiding forcible medication and the significant side effects

of antipsychotic medication.  Notwithstanding those

considerations, the Court concluded that an inmate's interests

are adequately protected, and perhaps better served, by allowing

the forcible medication decision to be made by medical

25

professionals, rather than a judge, "under fair procedural
mechanisms." Id. at 231.[13]  The Court found the challenged
policy to be fair.  The Court focused primarily on the facts that
the recommendation was made by a licensed psychiatrist and that
the decisionmakers were not involved in the prisoner's daily
care.  In addition, the Court was persuaded by the policy
provisions that the inmate had the right to be present at an
adversary hearing, the right to present and cross-examine
witnesses, and the right to judicial review.  These provisions
satisfied the due process requirement that the inmate be afforded
an opportunity to be heard at a meaningful time and in a
meaningful manner.  Id. at 235-36.

The Court specifically found that the Due Process Clause
does not require that an inmate in this situation be represented
by counsel, or be afforded a hearing conducted according to the

_____

[13] Here, the Court noted that,

Particularly where the patient is mentally disturbed,
his own intentions will be difficult to assess and will
be changeable in any event.  Respondent's own history
of accepting and then refusing drug treatment
illustrates the point.  We cannot make the facile
assumption that the patient's intentions, or a
substituted judgment approximating those intentions,
can be determined in a single judicial hearing apart
from the realities of frequent and ongoing clinical
observation by medical professionals.

Id. at 231-32 (citation omitted).

26

rules of evidence, or that a "clear, cogent, and convincing" standard of proof be applied.

Four days before Washington v. Harper was decided by the Supreme Court, the U.S. Court of Appeals for the Third Circuit addressed a corollary question, whether an inmate has a right to refuse medical treatment, generally, and held that prisoners retain a "limited" right to refuse medical treatment.  "[A] prison may compel a prisoner to accept treatment when prison officials, in the exercise of professional judgment, deem it necessary to carry out valid medical or penological objectives." White v. Napoleon, 897 F.2d 103, 113 (3d Cir. 1990). Accordingly, the decision of a medical professional to forcibly medicate a prisoner is presumed valid, "unless it is shown to be such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." Id. (citing Youngberg v. Romeo, 457 U.S. 307, 323 (1982)).

Here, the NJDOC Mental Health Services Internal Management Procedure for Non-Emergency Involuntary Medication Administration mirrors, in all relevant respects, the policy upheld in Washington v. Harper.[14]  Indeed, in some particulars, the NJDOC

---

[14] The NJDOC forced-medication procedure does not specifically provide for judicial review.  However, New Jersey law provides an absolute right to appeal any action or decision of a State administrative agency to the Superior Court, Appellate Division, both under the State Constitution, N.J. Const. Art. VI,

procedure goes beyond that approved in Washington v. Harper.  For example, under the NJDOC procedure, a prisoner is entitled to the assistance of a lay Staff Advisor.

Moreover, there is no suggestion that the Defendants did not follow the prescribed procedure.  To the contrary, the undisputed evidence before this Court establishes that prison officials scrupulously adhered to the procedure.  The undisputed evidence before the Court establishes that Plaintiff was diagnosed with a serious mental illness, that he lacked insight into his illness or the capacity to control his behavior, that his condition

---

Sec. 5, para. 4; Trantino v. New Jersey State Parole Board, 166 N.J. 113, 172 (N.J.), modified on other grounds, 167 N.J. 619 (2001), and under the New Jersey Court Rules, Pressler, Current New Jersey Court Rules, Rule 2:2-3(a)(2) (2001).  This exclusive procedure encompasses appeals from "inaction as well as action of a State administrative agency."  Trantino v. New Jersey State Parole Board, 296 N.J. Super. 437, 459-460 (App. Div. 1997), modified on other grounds and affirmed, 154 N.J. 19 (1998); Johnson v. State Parole Board, 131 N.J. Super. 513, 517-18 (App. Div. 1974), certif. denied, 67 N.J. 94 (1975).  See also Petrucelli v. Department of Civil Service, 28 N.J. Super. 572, 575 (App. Div. 1953) ("The import of the rule embraces official administrative conduct of a negative character as well, such as, for example, the refusal to consider a meritorious petition, or to conduct a hearing, or to render any decision in a controversial cause appropriately before the [agency].").

Moreover, if a New Jersey agency fails or declines to consider an administrative appeal from a decision of a lower agency official, the decision sought to be appealed is deemed the agency's final decision for purposes of any subsequent appeal to the state appellate courts.  See, e.g., New Jersey State Parole Board v. Cestari, 224 N.J. Super. 534, 542 n.2 (App. Div.), certif. denied, 111 N.J. 649 (1988) (where the full Parole Board declines to consider an administrative appeal from an Adult Panel of the Board, "the decision of the Adult Panel is the final decision of the agency").

deteriorated with treatment and, conversely, that it improved with treatment, that each recommendation for forced medication was made by licensed psychiatrist personally familiar with his case, that he had a meaningful and timely opportunity to be heard with respect to the proposed forcible medication, that the forcible medication decision was made by an independent committee, that he was forcibly medicated only in accordance with the approved forcible medication protocol and only when he refused treatment, that appropriate care was taken to address his complaints of side effects.  In the absence of any evidence to contradict the medical evidence presented, all defendants are entitled to summary judgment.

### V.   CONCLUSION

For the reasons set forth above, the Motions [47, 48] for summary judgment will be granted.[15]  An appropriate order follows.

/s/ Joel A. Pisano
Joel A. Pisano
United States District Judge

Dated: February 17, 2011

---

[15] In view of the disposition of the case on the grounds discussed in this Opinion, it is not necessary to consider the Defendants' other asserted grounds for dismissal or, in the alternative, for summary judgment.

29